## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TRADE FINANCE PARTNERS, LLC,<br>a limited liability company,<br><br>                Plaintiff,<br><br>      v.<br><br>AAR CORP., d/b/a AAR AIRCRAFT<br>COMPONENT SERVICES, a corporation,<br>and AAR ALLEN SERVICES, INC.,<br>a corporation<br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)   **No. 06 C 3466**<br>)<br>)   **Judge Rebecca R. Pallmeyer**<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a breach of contract and fraud action between Plaintiff Trade Finance Partners, LLC ("TFP"), on the one hand, and Defendants AAR Corp. and AAR Allen Services, Inc. ("AAR Allen"), on the other. AAR Corp. is a Delaware corporation with its principal place of business in Illinois; it provides various products and services for the aviation/aerospace industry. AAR Corp. is also the parent company to AAR Allen, an Illinois corporation with its corporate headquarters in Illinois. TFP is a New York limited liability company whose "trade finance" business includes providing business opportunities for its clients; its sole member is a Connecticut citizen, and its principal place of business is Connecticut. Thus, the court has diversity jurisdiction over this action. TFP and Defendant AAR Allen signed the "Strategic Trade Agreement" (the "STA") in early 2005. In that agreement, the entities agreed that TFP would solicit business for AAR Allen from companies the parties identified as "Target Accounts." In return, AAR Allen agreed to pay TFP a retainer upon signing of the STA. After TFP secured a purchasing or supply contract for AAR Allen from a Target Account, AAR Allen agreed to pay TFP an additional retainer and a percentage of the profits and efficiencies generated through the contract.

Then, in June 2005, AAR Allen and Northwest Airlines ("NWA") entered into a "Repair Services General Terms Agreement" (the "NWA-AAR Contract"). In this lawsuit, TFP contends that

NWA should be deemed a "Target Account," and that TFP is entitled to payment of the retainer and a percentage of the profits AAR Allen realized from the NWA-AAR Contract. By failing to compensate TFP in connection with the NWA-AAR Contract, TFP alleges that AAR Corp.–purportedly liable as AAR Allen's parent company under an alter ego theory–and AAR Allen (together the "AAR Defendants") breached the STA. TFP also asserts that the AAR Defendants fraudulently induced TFP to enter the STA by promising to formally designate NWA as a Target Account, without ever intending to do so. The heart of TFP's claim is that NWA was a Target Account, and that TFP's efforts caused NWA to order products and services from the AAR Defendants and/or their affiliates. (2d Am. Compl. ¶ 21.) TFP alleges that, absent those efforts, NWA would not have ordered products and services from the AAR Defendants or their affiliates. (*Id.* ¶ 22.) Under the STA, TFP therefore claims that it is owed compensation. (*Id.* ¶ 23.)

In the governing complaint, TFP brings four causes of action: breach of contract against AAR Corp. (Count I), fraud against AAR Corp. (Count II), breach of contract against AAR Allen (Count III), and fraud against AAR Allen (Count IV). (2d Am. Compl.) All four claims explicitly rest on TFP's purported role in securing AAR Allen business from NWA. (*Id.* ¶¶ 30 (breach of contract against AAR Corp.); 40 (fraud against AAR Corp.); 45 & 49 (breach of contract against AAR Allen); 59 (fraud against AAR Allen).) Because there is no evidence from which a reasonable juror could conclude that TFP's efforts did, in fact, secure the NWA-AAR Contract, the AAR Defendants are entitled to summary judgment on all claims. TFP has also filed a motion for sanctions related to an electronic discovery dispute; that motion is denied.

# FACTS[1]

## I.    The Parties

TFP claims to be a New York limited liability corporation (but is presumably a limited liability company) with its principal place of business in Greenwich, Connecticut.  (AAR 56.1 ¶ 1.)  TFP's sole member is Callen Cooper, a Connecticut citizen.  (*Id.* ¶ 2.)  AAR Corp. is a Delaware corporation with its corporate headquarters in Wood Dale, Illinois.  (*Id.* ¶ 2.)  AAR Corp. provides products and services for the aviation/aerospace industry, including both commercial and government customers.  AAR Corp. is a parent to AAR Allen, which is an Illinois corporation with its corporate headquarters in Wood Dale, Illinois and its main office in Long Island, New York.  (*Id.* ¶ 3; AAR Am. 56.1 Resp. ¶ 1.)  With respect to AAR Allen's relationship with TFP, Cooper identifies two of the key players for AAR Allen as: Robert Bruinsma (General Manager) and Frank Boni (a sales executive).  (Cooper Decl. dated 10/15/07 ¶ 7, Ex. A to TFP 56.1.)[2]

---

[1]    The facts presented here are drawn from the parties' Local Rule 56.1 Statements: the AAR Defendants' Local Rule 56.1(a) Statement (cited here as "AAR 56.1"); Plaintiff's Local Rule 56.1(a) Response to Defendants' Statement and Local Rule 56.1(b) Statement of Additional Facts ("TFP 56.1 Resp." and "TFP 56.1," respectively); and the AAR Defendants' Response to Plaintiff's Additional Facts ("AAR 56.1 Resp.").  In addition, in two separate filings, TFP amended paragraphs one and four of its Statement of Additional Facts, and Defendants responded to each.  Those filings will be cited as "TFP Am. 56.1" and "AAR Am. 56.1 Resp."  Finally, rather than provide an appendix consisting solely of evidence relied on in its Rule 56.1 Statement, TFP has provided full copies of certain depositions and their exhibits.  Accordingly, the court cites to exhibits as appended to particular depositions where necessary.

The AAR Defendants request that the court disregard certain facts from Callen Cooper's Declaration, on the ground that they were not properly incorporated into TFP's Rule 56.1 Statement. (AAR 56.1 Resp. at 1-2.)  The AAR Defendants have not, however, identified the particular statements they ask this court to disregard, and the court therefore overrules this objection.

[2]    There is a dispute as to whether AAR Corp. is a proper defendant in this action, as it is not party to the STA.  TFP named AAR Corp. as a defendant because it contends that AAR Allen was merely an appendage of AAR Corp. and, thus, that the corporate veil should be pierced. According to TFP, AAR Corp. substantially controlled and directed AAR Allen in connection with the Agreement.  (TFP Am. 56.1 ¶ 1; TFP 56.1 Resp. ¶ 4.)  Defendants counter that the two entities are separate.  (AAR 56.1 ¶ 4; AAR Am. 56.1 Resp. ¶ 1.)  Because the court concludes that TFP's claims fail on their merits, it need not reach that issue in this opinion.

3

TFP describes itself as "a trade finance firm," which provides "new business and asset recovery programs" for its clientele. (2d Am. Compl. ¶ 9.) Callen Cooper is TFP's President and managing member. (Cooper Decl. ¶ 1; TFP 56.1 ¶ 7.) TFP's business model is set forth in a document entitled: "Trade Finance Partners' Business Model." (AAR 56.1 ¶ 7.) There are two aspects to that business, described by TFP as "value restoration to impaired assets" and "new business opportunities for the purchase of idle production capacity." (Cooper Dep. 44:1-13, Ex. E to AAR 56.1.) Without suggesting that it has a thorough understanding of TFP's business, the court notes that, in its Business Model document, TFP asserts that it buys certain types of assets from clients at significantly higher than market value with what TFP refers to as a "cross purchase option" or "CPO"; according to TFP, clients can then use the CPO "to offset cash (as a cash savings) in the purchase of goods and services required in their operations." (TFP Business Model, Ex. 1 to Cooper Dep.) In other words, the CPO operates as a cash alternative that companies apply toward the purchase of products and services. (*Id.*)

## II.    The STA

TFP and AAR Allen signed the Strategic Trade Agreement. (STA, Ex. C to AAR 56.1.) Bruinsma signed the STA on behalf of AAR Allen on January 10, 2005; Cooper executed the STA on behalf of TFP on February 1, 2005. (*Id.*) In the agreement, AAR Allen retained TFP as its agent for securing Target Accounts, which are companies AAR Allen "has specifically identified to TFP on a completed TFP Target Account Request for Information ('RFI')." (*Id.* § 1.) Put another way, Target Accounts "shall mean entities which have been identified by [AAR Allen] and/or TFP and with which [AAR Allen] desires to enter a contractual relationship for the sale of specific Products and/or Services as a result of the efforts or involvement of TFP." (*Id.* § 2.5.) The STA further "accepted that a Target Account may be identified in other written or verbal communication between [AAR Allen] and TFP, subject to further confirmation in a written Target Account RFI." (*Id.* § 1.) The STA made clear that "no companies shall be deemed a Target Account until it has been agreed as

such by both [AAR Allen] and TFP in a written Target Account RFI." (*Id.*) That RFI must be in substantially the same form and substance as the sample attached to the STA as Exhibit 1. (*Id.*) The parties dispute whether the STA precludes the parties from naming a Target Account without a formal RFI, but the court need not decide this issue to resolve the dispute and, accordingly, declines to do so.[3]

Pursuant to the STA, AAR Allen agreed to pay TFP the first part of a retainer–$25,000–within ten days of execution the contract, as well as a second installment–$35,000–within thirty days of execution of the first Supply Contract with a Target Account. (STA § 7.1.) AAR Allen did pay TFP the $25,000 retainer, although TFP alleges that it was paid "substantially late." (AAR 56.1 ¶ 19; TFP 56.1 Resp. ¶ 19.) In the event that TFP did secure business from a Target Account for AAR Allen, the STA also entitled TFP to a Business Development Fund ("BDF"), which would consist of a percentage of "incremental profits and overall manufacturing efficiencies generated through [AAR Allen's] sales of Products and/or Services to a Target Account(s)." (AAR 56.1 ¶ 21.) On October 26, 2005, an AAR Allen representative notified TFP that it intended to terminate the STA in thirty days; the STA was thereafter treated as terminated. (2d Am. Compl ¶ 24.)

---

[3]     In connection with the discussion of how a Target Account is properly identified, and whether NWA was properly identified as a Target Account, the parties discuss an unrelated RFI. On December 4, 2004–before signing the STA–AAR Allen completed a written RFI for America West Airlines ("AWA"). (AAR 56.1 ¶¶ 30-31.) The parties dispute whether the AWA RFI was attached to and incorporated into the STA. (TFP 56.1 Resp. ¶ 32; AAR Am. 56.1 Resp. ¶ 4.) Bruinsma attests that the completed AWA FRI was, in fact, attached and incorporated into the Agreement when he signed it on AAR Allen's behalf. (Bruinsma Decl. dated 8/30/07 ¶ 11, Ex. D to AAR Mem.) Cooper, in contrast, attests that the fully-executed STA did not contain a copy of the AWA RFI. (Cooper Decl. ¶ 44.) TFP notes that Bruinsma and another AAR Allen employee authenticated copies of the Agreement that did not include the AWA RFI. (TFP Am. 56.1 ¶ 4.) The AAR Defendants counter that neither employee was asked whether the STA they reviewed was *complete*. (AAR Am. 56.1 Resp. ¶ 4.) If the AWA RFI were in fact attached to and incorporated into the STA, this would undermine TFP's claim that the parties verbally identified NWA as a target account before the STA was signed, and that the identification survives execution of the STA, a contract with an integration clause.

III.    **NWA-AAR Contract**

In 2004, NWA sent out a Request for Proposal ("RFP") seeking proposals to provide Maintenance, Repair, and Overhaul ("MRO") services related to avionic, pneumatic, and hydraulic components. (AAR 56.1 ¶ 50.) The parties variously refer to this as an "MRO RFP" and a "pneumatic and hydraulic component RFP." It was issued through Aeroxchange, a "business-to-business e-commerce platform" through whom NWA had previously solicited proposals. (*Id.* ¶¶ 47-48, 52.) As of January 2005, this was the only outstanding RFP that NWA had issued with respect to hydraulic and pneumatic controls. (*Id.* ¶ 51.) Aeroxchange and NWA generally followed the following procedure with regard to RFPs: NWA would format the RFP, Aeroxchange would distribute it to potential vendors, potential vendors would send proposals in response to the RFP, and Aeroxchange would forward those proposals to NWA. (*Id.* ¶ 49.)[4] In or about October 2004–approximately three months before the STA was signed–AAR Allen submitted an initial proposal in response to NWA's RFP. (*Id.* ¶ 53-54.) Despite ample opportunity during the summary judgment briefing, the parties have provided few details regarding how the relationship between AAR and NWA progressed from that point forward. All that is clear is that, in February 2005, AAR Allen received a "Phase 2" RFP from NWA. (TFP 56.1 ¶ 17.) That RFP bears the Aeroxchange logo and contact information, and is entitled "Northwest Airlines Hydraulic and Pneumatic Component Repair (Phase 2)." (RFP dated 2/1/05, Ex. C to TFP 56.1.) No information is available regarding what prompted this Phase 2 RFP.

In June 2005, AAR Allen and NWA entered into the NWA-AAR Contract, which related to pneumatic and hydraulic components. (NWA-AAR Contract, Ex. 33 to Ex. F to AAR 56.1; AAR 56.1

---

[4]     Relying on Cooper's declaration, TFP alleges that NWA "could and did" invite bidders to resubmit or supplement bids. (TFP 56.1 Resp. ¶ 49.) TFP contends that the contract NWA ultimately entered into with AAR was based on a supplementation of the first proposal NWA submitted in October 2004, and that TFP played a role in making NWA amenable to awarding AAR Allen the business in early 2005, before AAR Allen submitted its revised proposal.

¶ 56.) That contract obligates AAR Allen to provide certain repair services and/or articles for NWA, who, in turn, agrees to purchase certain of those repair services and/or articles exclusively from AAR Allen, and others non-exclusively. (*Id.* §§ 2.1-2.6.) The parties dispute what prompted NWA to award AAR Allen the NWA-AAR Contract, and, in particular, TFP's involvement in securing that contract. (*See* TFP 56.1 Resp. ¶ 55.) AAR Allen contends that it was awarded the contract in response to the October 2004 proposal it submitted in response to NWA's RFP; TFP counters that AAR Allen secured the contract through a supplementation of the proposal. (*Id.* ¶ 55.) The parties debate the import of TFP's communications with NWA in effectuating the NWA-AAR Contract.

The parties agree on the key players to the NWA-AAR Contract, from NWA's perspective. Timothy Johnson has been NWA's Director of Technical Commodity Management for NWA since mid-2004; before that, he was NWA's Manager for Project Materials for approximately three years. (AAR 56.1 ¶¶ 57-58.) Johnson was involved in NWA's decision to award the NWA-AAR Contract to AAR Allen. (*Id.* ¶ 70.) Johnson was also a decision-maker regarding whether NWA would engage in a relationship with TFP as a result of the communications TFP initiated in January 2005. (*Id.* ¶ 67; Cooper Decl. ¶ 35.) The other NWA employee who played a role in discussions with TFP is Craig Ronald Reidlinger, who has been NWA's Director of Procurement and Contracting since July 2006; before that, he was NWA's Mechanical Commodity Manager from 2002 to 2006. (AAR 56.1 ¶¶ 59-60.) In 2004 and 2005, Reidlinger's duties included purchasing spare parts and repair services for hydraulic and pneumatic components. (*Id.* ¶ 61.) Johnson was one of Reidlinger's superiors. (*Id.* ¶ 62.) There is no evidence that Reidlinger was a decision maker with respect to the NWA-AAR Contract.

Johnson's and Reidlinger's testimony demonstrates that TFP had no role in securing the NWA-AAR Contract for AAR Allen. Indeed, Johnson explicitly avowed that TFP played no role in the decision. (Johnson Dep. 95:1-8, Ex. G to TFP 56.1.) More generally, when asked whether NWA was, after January 11, 2005, open to a proposal from TFP that would have entailed NWA's

accepting an outstanding AAR Allen proposal for providing MRO services under his department, Johnson replied that TFP's proposals were not of value or interest to NWA. (*Id.* at 89:10-92:4.)[5] In other words, Johnson testified that TFP's business model was of no value to NWA. Johnson and Reidlinger each testified that the proposal TFP made to them involving AAR related to landing gear–not hydraulic and pneumatic components. (AAR 56.1 ¶ 65.)[6] NWA, then, cannot confirm that TFP made any proposal whatsoever to NWA related to the NWA-AAR Contract.

Based largely on Johnson's and Reidlinger's testimony, the court concludes that TFP did not procure the NWA-AAR Contract. As a result, TFP was not entitled to any additional compensation–either in the form of retainer or Business Development Fund–from AAR Allen in connection with the STA. TFP therefore cannot demonstrate that it suffered any damages, a required element of any breach of contract or fraud claim. Thus, the AAR Defendants are entitled to summary judgment on all claims.

## DISCUSSION

### I.    Jurisdiction

TFP is a New York limited liability company with its principal place of business in Connecticut. (AAR 56.1 ¶ 1.) Its sole member is a Connecticut citizen. (*Id.*) AAR Corp. is a Delaware corporation with its corporate headquarters in Illinois. (AAR 56.1 ¶ 2.) AAR Allen is an Illinois corporation with its corporate headquarters in Illinois and its main office in New York. (*Id.*

---

[5]    Countering the weight of this testimony, TFP points out that Johnson admitted incomplete recollection of his dealings with TFP. Even if true, this does not actually contradict Johnson's testimony, absent testimony from Cooper or any other TFP representative that Johnson indicated interest in TFP's business proposals.

[6]    Johnson testified that the "particular issue of landing gear was what we were focusing on with Trade Finance Partners." (Johnson Dep. 47:10-22.) Reidlinger testified that, at the meetings, TFP proposed services regarding landing gear and nothing else with respect to AAR. (Reidlinger Dep. 60:17-24.) TFP does not directly contest this but, rather, contends that Reidlinger and Johnson had "incomplete recollection" of their meetings with TFP. (TFP 56.1 Resp. ¶ 65.) As discussed above, however, this does not create a genuine dispute of material fact and, accordingly, the court accepts Johnson's and Reidlinger's testimony as true.

¶ 3.)  The parties agree that the amount in dispute exceeds $75,000 (Ans. ¶ 5), and, accordingly, this court has diversity jurisdiction over the parties' dispute.

## II.    Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The court is not required to draw every conceivable inference from the record, however; "mere speculation or conjecture" will not defeat a summary judgment motion.  *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (citation omitted).

## III.   Breach of Contract

The STA contains a choice of law clause dictating that the STA shall be governed by New York law.  (STA § 16.)  In addition, the parties agree that New York law governs this dispute.  (AAR Mem. at 5 n.5.; TFP Resp. at 5-18 (applying New York law).)  Under New York law, a plaintiff claiming breach of contract must prove four elements: "(1) the existence [of] a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (citations omitted); *see also ALJ Capital I, L.P. v. David J. Joseph Co.*, No. 601591/06, 841 N.Y.S.2d 217 (Table), 2007 WL 1218355, at *4 (N.Y. Sup. Mar. 13, 2007).  In order to survive summary judgment, TFP must demonstrate that there are disputes of fact on each of these elements.  *Marks*, 61 F. Supp. 2d at 88-89; *ALJ Capital*, 2007 WL 1218355, at *4.

As explained above, TFP's breach of contract claims relate to AAR Allen's contract with

NWA.  The parties agree that AAR Allen paid TFP the initial $25,000 retainer to which it was entitled under the STA.  (AAR 56.1 ¶ 19.)  TFP is entitled to additional compensation–in the form of a BDF or retainer–only if it secured business from a Target Account for AAR Allen.  (STA §§ 2.1 & 7.1; AAR 56.1 ¶ 21.)  According to TFP, the parties designated NWA as a Target Account prior to Bruinsma's execution of the STA; based on this designation, TFP engaged in efforts that resulted in the NWA-AAR Contract; but AAR Allen breached the STA by failing to compensate TFP for the NWA business.  (2d Am. Compl. ¶¶ 19, 21-23.)  If TFP did not secure the NWA-AAR Contract, which is the only business it claims to have procured for AAR Allen, it was not entitled to compensation for the NWA business and AAR Allen is not in breach.

## A.    AAR Defendants' Theory

The AAR Defendants argue that neither AAR Corp. nor AAR Allen had any duty to compensate TFP because TFP never secured any business from NWA for AAR Allen.  (AAR Mem. at 10.)  The only evidence from the NWA representatives responsible for the NWA-AAR Contract supports this understanding.  As discussed above, the parties agree that Johnson was a decision-maker with regard to whether NWA would form a business relationship with TFP.  (AAR 56.1 ¶ 67.)  Johnson testified that during early 2005, NWA's mechanics were on strike, and he was coping with the ensuing financial difficulties.  As a result, he testified that he had neither time for nor interest in TFP's proposal.  He explained that TFP "could not bring to the table any better value than my department could obtain in the marketplace," that TFP "brought no value to the table for AAR," and that, "frankly, at the time, I didn't have time to entertain financing schemes from Trade Finance Partners, or a number of other companies that came to us while we were in distress, offering to provide us great value for financing our undervalued resources, our inventory. . . ."  (Johnson Dep. 89:10-92:4.)  In short, Johnson made clear that TFP's business model was of no value to NWA.

In addition, Johnson claimed to have familiarity with the reasons that NWA ultimately opted to enter into the NWA-AAR Contract.  (Johnson Dep. 94:18-25.)  When asked about TFP's role,

Johnson testified as follows:

Q; . . . . Did the actions -- did TFP's actions or conduct in their dealings with you in your department play any part whatsoever in the decision to award the contract which is Exhibit 33 to AAR?

A: No.

(Johnson Dep. 95:1-8.)   Based on this testimony, AAR asserts that TFP's efforts did not influence NWA's decision to do business with AAR.  (AAR 56.1 ¶ 69.)[7]

## B. TFP's Theory

TFP tells a different story, contending that, after AAR Allen signed the STA on January 10, 2005, TFP "immediately began pursuing the AAR bid work from NWA."  (TFP Resp. at 3.)  It is undisputed that, in late 2004 and/or early 2005, Johnson communicated with TFP representatives. (AAR 56.1 ¶ 63.)   Later–but during that same time period–Johnson and Reidlinger met with TFP representatives regarding a TFP proposal in which TFP claimed it could provide value to NWA for certain undervalued inventory.  (*Id.* ¶ 64.)   Johnson and Reidlinger recalled that TFP's proposal related to AAR's ability to service landing gear.  (*Id.* ¶ 65.)  Details about this landing gear proposal are not available in the record.  This is irrelevant, however, as neither party appears to argue that the landing gear proposal related to the NWA-AAR Contract, which involved hydraulic and pneumatic components.  In any case, at some date not clear in the record, NWA determined that AAR Allen's offer to service landing gear was not "price competitive" and did not award AAR Allen that contract.  (*Id.* ¶ 66.)   Thus, it appears that the landing gear proposal never evolved into a contractual agreement for NWA.

---

[7]      Encouraging the court to ignore Johnson's testimony as biased, TFP points to AAR Production Docs. A4806-07 & A4863-64, which AAR has provided to the court.  In the first document, Johnson thanks AAR "for your outstanding performance."  (E-mail from Johnson to Boni of 11/11/05, Ex. D to AAR Reply.)  In the second–an e-mail from Dale Wilkinson of NWA and not Johnson–Wilkinson alerts Boni to a possible mechanic strike, and Boni offers to assist.  (E-mail from Wilkinson to Boni of 8/3/05, Ex. E to AAR Reply.)  Neither communication suggests, much less establishes, Johnson's bias.

TFP nevertheless urges that its efforts to lobby NWA changed NWA's perceptions of AAR, paving the way for the NWA-AAR Contract. (TFP 56.1 Resp. ¶ 69.) TFP alleges that, before February 9, 2005, Reidlinger and Johnson believed that AAR Allen was not price-competitive and was a "problem supplier." (*Id.*) TFP relies almost exclusively on Cooper's declaration to flesh out the details of TFP's relationship with NWA. (TFP Resp. at 3.) As relevant here, that relationship began on January 11, when Cooper claims to have told Johnson that AAR Allen was "our trade partner from whom NWA would be able to purchase component repair services with an incremental economic benefit" provided by the partnership. (Cooper Decl. ¶ 35.) Cooper then contends that he discussed AAR Allen's outstanding bids on "hydraulics and avionics" with AAR Allen. (*Id.* ¶ 36-37.) On January 13, Johnson e-mailed Cooper and stated: "I don't agree that AAR's pricing is competitive. We have not been able to reach agreement with AAR on a several [sic] projects for a number of reasons. Due to confidentiality reasons, I cannot divulge the specific causes." (Cooper Decl. ¶ 38; E-mail from Johnson to Cooper of 1/13/05, Ex. 110 to Johnson Dep.) Following this, Cooper claims, he communicated with AAR Allen repeatedly regarding the STA, AAR Allen's attempts to secure business from NWA, and other business prospects. (Cooper Decl. ¶¶ 39-44.)

Then, on February 9, Cooper claims to have had a conversation with Reidlinger, in which Reidlinger told Cooper that NWA had longstanding problems with AAR Allen regarding its business, including that AAR Allen's lawyer had changed transaction terms at the last minute in a prior transaction and that AAR Allen's pricing was not "in line." (Cooper Decl. ¶ 45.) He allegedly told Cooper that AAR needed to follow the process NWA sets, if it wished to do business with the company. (*Id.*) Based on these complaints, Cooper claims to have asked whether TFP was doing a good job in changing NWA's perceptions of AAR Allen. (*Id.*) Reidlinger purportedly told Cooper that "AAR is not out of the game." (*Id.*) Cooper then claims that he asked Reidlinger whether NWA would visit AAR Allen's facilities, as AAR Allen had asked TFP to facilitate a site visit; Reidlinger told Cooper he would consider it and follow up with Boni. (*Id.*) Cooper sent Boni and Bruinsma an

e-mail recounting this conversation on February 9, which is available in the record.  (*Id.*; E-mail from Cooper to Boni of 2/9/05, Ex. 56 to Boni Dep., Ex. H to TFP 56.1.)  In that e-mail, Cooper recounts that NWA identified "inventory for the TFP program that would be applicable for shifting business to AAR."  (*Id.*)  He did not specify what either the NWA inventory or AAR business might be.  But, according to Cooper, NWA had concerns regarding pricing and last-minute changes made by NWA's lawyers.  (*Id.*)  Cooper went on to explain that he told Reidlinger that TFP was acting as an impartial third party and would only be compensated when NWA obtained an economic benefit. (*Id.*)  He also notified Boni and Bruinsma that "AAR is not out of the game," that Reidlinger would contact Boni regarding a site visit, and that "this is becoming more solid by the day."  (*Id.*)

### C.    Johnson's E-mail

Of these facts, only the conversations with Johnson and Reidlinger could have bearing on the issue of TFP's role in securing the NWA-AAR Contract.  AAR challenges the admissibility of Johnson's e-mail as hearsay.  To the extent that TFP relies on the e-mail to demonstrate that NWA "strongly disfavored new long term contracts with AAR," (TFP Sur-reply at 2), however, it appears that the e-mail is not offered for the truth of the matter asserted in Johnson's communication but, rather, to show that NWA preferred not to work with AAR as of January 2005.  FED. R. EVID. 801.  Even if it is admissible, however, the court finds this e-mail insufficient to create a genuine issue of material fact as to whether NWA did, in fact, disfavor AAR as a vendor.

TFP urges that Johnson's e-mail shows that NWA was predisposed not to award AAR Allen the hydraulic and pneumatic component repair work until TFP became involved.  The court disagrees.  During his deposition, Johnson acknowledged that the e-mail "appears to be sent by me from my email address," though he did not recall sending it.   (Johnson Dep. 44:22-45:11.)  Johnson explained, however, that the pricing concerns and other obstacles to an agreement with AAR did not relate to the pneumatic and hydraulic component proposal at issue in this litigation.  Instead, the e-mail and concerns expressed therein related to the landing gear proposal.  (Johnson

Dep. 47:10-22.) Nothing in the text of the e-mail or elsewhere in the record contradicts this characterization of the concerns he expressed. In fact, Reidlinger corroborated that NWA's pricing concern was specific to the landing gear proposal and did not relate to AAR's proposal for hydraulic and pneumatic components. (Reidlinger Dep. 54:15-56:11.) Outside of the landing gear proposal, Johnson testified that NWA had awarded AAR a "significant amount of work" in its Garden City, New York facility and had a "long history of dealing with AAR in all their business." He noted that "most airlines cannot help but use AAR for repair services because of their breadth of capabilities and their attractive pricing in the marketplace." (Johnson Dep. 332:23-34:22; 47:10-22.) Again, Reidlinger corroborated Johnson, testifying that NWA did other business with AAR and had no specific reason to refuse to do business with AAR. (Reidlinger Dep. 63:4-25.)

Johnson explained that, in the e-mail addressing pricing concerns and other reasons NWA could not reach agreement with AAR, he was attempting to reject TFP's overtures gracefully. He told TFP that NWA was not able to reach agreement with AAR because he was tired of dealing with TFP; he was "too nice of a gentleman" to tell TFP that there was no substantive reason for NWA to look at TFP's proposal. (Johnson Dep. 45:18-46:24.) The e-mail was an excuse for ceasing conversations with TFP rather than an accurate explanation of NWA's reasons for doing so. TFP has offered no evidence to contradict Johnson's testimony regarding the purpose of the e-mail and the depth of NWA's relationship with AAR. Thus, the e-mail is not probative on the issue of TFP's involvement in securing the NWA-AAR Contract. When viewed in the only context provided by the author and the parties, it does not suggest that NWA disfavored AAR as a vendor, or that TFP's role as a broker was instrumental in changing that relationship.

### D. Reidlinger Conversation

TFP also relies on Cooper's February 9 telephone conversation with Reidlinger, and the resulting e-mail to Boni and Bruinsma, as evidence of the role it played in securing the NWA-AAR Contract. Significantly, there is no evidence that Reidlinger was actually a decision maker with

14

respect to the NWA-AAR Contract, which minimizes the impact of his perspective. Beyond this, however, Reidlinger's statements to Cooper and the resultant e-mail to Boni and Bruinsma are plainly out-of-court statements offered for the truth of the matter asserted; they are therefore inadmissible unless they fall under a hearsay exception. FED. R. EVID. 801(c) & 802. TFP apparently concedes as much, as it seeks to invoke Rule 807, the catch-all exception to the hearsay rule. (TFP Sur-reply at 3.)[8]

Under Rule 807, such communication is admissible only if it: (1) has circumstantial guarantees of trustworthiness equivalent to statements covered by the other hearsay exceptions; (2) is offered as evidence of a material fact; (3) is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (4) serves the interests of justice. The Rule is to be used only "sparingly" and reserved for "exceptional cases." *Doe v. United States*, 976 F.2d 1071, 1074 (7th Cir. 1992) (citation omitted). The court cannot find the four-part test met, or that this is an exceptional case. The absence of circumstantial guarantees of trustworthiness is significant. Cooper's recollection, as reflected in his affidavit and e-mail, may well be biased or inaccurate, and he had every reason to misrepresent the communication with Reidlinger to his client, in order to inspire confidence. That TFP points to no testimony or documents supporting Cooper's recollection is notable. For example, Reidlinger's testimony does not corroborate that Cooper, or TFP, caused NWA to visit AAR Allen's facility. (AAR 56.1 Resp. ¶ 13.) To the contrary, Reidlinger explained that NWA scheduled a trip to AAR Allen's facilities as part of the process of reviewing AAR's proposal. (Reidlinger Dep. 80:23-81:10.) While Reidlinger recalled having meetings with TFP by February 9, 2005, he testified that the instruction that AAR needed to follow NWA's processes completely related to the landing gear

---

[8] TFP suggests briefly that evidence of the Cooper-Reidlinger conversation as non-hearsay offered to prove Cooper's state of mind. But TFP never identifies any issue to which Cooper's state of mind is relevant, and the statements are thus only relevant if offered to prove the truth of the matter asserted.

proposal.  (Reidlinger Dep. 68:25-69:17.) Reidlinger did not recall telling Cooper that AAR was not

"out of the game."  (Reidlinger Dep. 73:9-77:1.)  As a result, there is no circumstantial guarantee

of trustworthiness sufficient to trigger Rule 807.

In addition, TFP could have produced other evidence of the status of TFP's efforts to broker

a hydraulic and pneumatic component contract with NWA for AAR as of February 2005–such as

Reidlinger's direct testimony or affidavit–through reasonable efforts.  *See Andrekus v. Bd. of Educ.*

*of Dist. U-46*, No. 02 C 3960, 2004 WL 2535274, at *9 (N.D. Ill. Sept. 28, 2004) (handwritten note

deemed inadmissible hearsay not subject to Rule 807 where author could sign an affidavit or be

deposed; note not considered to defeat motion for summary judgment).  TFP baldly asserts that

NWA–a non-party–and AAR control the information in question, rendering this an exceptional case.

The evidence belies this.  Reidlinger himself gave a deposition in this case, and, despite the

business relationship between NWA and AAR, there is no indication that Reidlinger would not sign

an affidavit regarding any concerns NWA had about working with AAR.  Accordingly, the e-mail is

not admissible pursuant to Rule 807, and the court will not consider it in resolving this summary

judgment motion.  *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002).

TFP makes one other pitch for admitting this evidence as non-hearsay, suggesting that

Cooper's e-mail is admissible pursuant to Rule 803(1), which excludes from the hearsay rule any

"statement describing or explaining an event or condition made while the declarant was perceiving

the event or condition, or immediately thereafter." This exception does not apply here. "A declarant

who deliberates about what to say or provides statements for a particular reason creates the

possibility that the statements are not contemporaneous, and, more likely, are calculated

interpretations of events rather than near simultaneous perceptions." *Schindler v. Joseph C. Seiler*

*& Synthes Spine Co.*, 474 F.3d 1008, 1011 (7th Cir. 2007) (quoting *United States v. Woods*, 301

F.3d 556, 562 (7th Cir. 2002)).  Here, as in *Schindler*, the statement in question is a calculated

narration and TFP has presented no admissible evidence regarding immediacy.  Accordingly, it is

not a present sense impression.

Finally, as is the case with Johnson's e-mail, Reidlinger's statements do not speak to the hydraulic and pneumatic components contract and are therefore not relevant to the issues in this case. Instead, as discussed above, Reidlinger and Johnson agreed that the pricing concerns Reidlinger allegedly expressed to Cooper related to the landing gear proposal. Likewise, Reidlinger testified that he expressed concerns that AAR Allen needed to follow NWA's process in order to get NWA's business in regard to the landing gear proposal–not the hydraulic and pneumatic components contract. (Reidlinger Dep. 68:25-69:25.) Thus, even if the court were to consider Cooper's declaration or e-mail as evidence of NWA's understanding regarding AAR Allen, it would not constitute relevant evidence in with regard to the NWA-AAR Contract.

### E. Cooper's Declaration

In the end, then, the court is left solely with Cooper's declaration as evidence of the role TFP played in securing the NWA-Contract. Undermining Cooper's capability to testify as to why NWA decided to enter into the NWA-AAR Contract is his own deposition testimony. There, he testified as follows:

> Q:    Does Northwest agree with you that your overcoming those objections was the procuring cause for getting that contract?
>
> A:    I don't know what Northwest feels.
>
> Q:    Have you spoken with Tim Johnson about that subject?
>
> A:    That would be inappropriate.
>
> * * *
> Q:    So you don't know whether they agreed with the -- your belief that TFP was a procuring cause of the contract?
>
> * * *
> A:    It would be conjecture for me to assume to know anything that Northwest or executives at Northwest think.

(Cooper Dep. 154:3-25.) In other words, Cooper admits that he has no knowledge about how the

decision to award AAR Allen the NWA-AAR Contract was ultimately made. TFP concedes as much, contending that Cooper's lack of knowledge is a direct result of AAR Allen's withholding critical information from it. (TFP Sur-reply at 2.) But whatever the reason for the gap in Cooper's knowledge, it is clear that the court cannot rely on Cooper's attestations to create a genuine issue of material fact in this case.

TFP raises for the first time in Sur-reply a new theory for its breach of contract claim: it contends that AAR Allen breached the STA by failing to complete an RFI for the NWA project. (Sur-reply at 1-2.) This theory does not appear in the governing complaint and, accordingly, the court deems it waived. *See Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) (plaintiff may not "amend...complaint through allegations made in response to a motion for summary judgment"). Moreover, the court notes that this theory would not change the outcome here: TFP still fails to identify any damages it suffered for this alleged breach. The fact that TFP played no role in securing the NWA-AAR Contract and was therefore not entitled to compensation under the STA is determinative.

In sum, the AAR Defendants have identified compelling evidence–primarily Johnson's and Reidlinger's deposition testimony–that TFP played no role in securing the NWA-AAR Contract. As a result, TFP would not have been entitled to compensation under the STA beyond what it already received, either in the form of a retainer or commission. In response, TFP is unable to point to any admissible evidence of the role it claims to have played in facilitating this agreement. So far as the court can see, TFP never submitted any proposal to NWA but merely had a few isolated communications with NWA. There is no evidence that those communications related to the hydraulic or pneumatic component contract ultimately consummated between NWA and AAR; in fact, all available evidence points to the contrary conclusion. Consequently, the AAR Defendants are entitled to summary judgment on TFP's claims for breach of contract.

## IV.    Fraud

18

While the parties have engaged in no choice-of-law analysis with respect to TFP's fraud claims, the court concludes that the AAR Defendants are entitled to summary judgment under either Illinois or New York law. In fact, the elements of a claim for common law fraud are the same under Illinois and New York law. A party must prove five elements by clear and convincing evidence: "(1) a false statement of a material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 881-882 (7th Cir. 2005) (citation omitted) (Illinois law); *see also Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (New York law). TFP's fraud claim is, essentially, that AAR Allen never intended to complete an NWA RFI, but that AAR Allen knowingly represented the contrary to TFP, thereby inducing TFP to sign the STA and facilitate communications with NWA on AAR Allen's behalf. (TFP Resp. at 19.) TFP also claims to have relied on AAR Allen's prior designation of NWA as a Target Account and, ultimately, secured the NWA-AAR Contract as a result of its understanding. (TFP Resp. at 19-20.) Thus, in the governing complaint, TFP claims entitlement to compensatory and punitive damages for the AAR Defendants' fraud. (2d Am. Compl. ¶¶ 44A & 63A.) As with its breach-of-contract claim, however, TFP must prove that it sustained damages as a prerequisite to recovering for fraud. In light of the evidence that TFP played no role in securing the NWA-AAR Contract, it was not entitled to the additional retainer or a BDF under the STA.

In this briefing, TFP also claims entitlement to *quantum meruit* recovery for its fraud claims. (TFP Resp. at 20.) But the STA governs the parties' relationship with regard to this dispute, and dictates what, if any, compensation TFP would be entitled to for its alleged work on AAR Allen's behalf. In fact, the STA expressly dictates that TFP is only entitled to compensation beyond what it already receiving upon signing the STA if it secured additional business for AAR Allen from a Target Account. Because the STA's terms govern the parties' relationship, neither Illinois nor New

York law permits TFP's claims for *quantum meruit*. *See Keck Garrett & Assocs., Inc. v. Nextel Comm'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) ("Illinois law does not permit a party to recover on a theory of quasi-contract when an actual contract governs the parties' relations on that issue."); *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.") (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89, 516 N.E.2d 190, 521 N.Y.S.2d 653 (N.Y. 1987)). Consequently, even considering TFP's newest theory, TFP cannot establish that it suffered any damages and cannot prove its fraud claim.

## V.    Discovery Sanctions

In connection with a discovery dispute, TFP seeks sanctions against the AAR Defendants. TFP originally moved for default judgment due to the AAR Defendants' purported spoliation of evidence on August 30, 2007. (Docket Entry No. 65.) Specifically, AAR argued that the AAR Defendants had destroyed electronic correspondence from late 2004, the time period immediately preceding execution of the STA. The court denied this motion on September 7, though it reserved ruling on whether it might be appropriate to draw an adverse inference based on the alleged spoliation. (Docket Entry No. 67.) The court explained that AAR's November 2005 policy was that employees purge all e-mails not in use. As a result, there was nothing improper about the fact that e-mails from late 2004 had been deleted as of November 2005, pursuant to that corporate policy. Now, TFP now claims that newly-discovered evidence makes clear that the AAR Defendants destroyed e-mails and other electronic evidence from the time period of September through November 2004, and therefore asks the court to reconsider its prior ruling and enter a default judgment, deny the AAR Defendants' motion for summary judgment, or issue an adverse inference due to the claimed spoliation. (TFP Sanctions Mot.) Essentially, TFP's position is that the AAR Defendants' production of 5,000 pages of financial data included a series of e-mails never before

20

produced. (*Id.* at 2-3.) This series of e-mail was printed on June 8, 2007 (and therefore cannot be newly discovered). (*Id.* at 2-3.) These e-mails bore the header "CHAdmin," which TFP points to as evidence that they were generated from an administrative server. (*Id.* at 4-5.)[9]

TFP claims that the failure to produce the e-mail earlier demonstrates that the AAR Defendants are guilty of spoliation of evidence. It bases this contention on purportedly conflicting explanations of the record retention policy that defense counsel provided. On August 29, 2007, defense counsel explained by e-mail to plaintiff's counsel that AAR's policy since 1995 had been to retain all documents only so long as retention serves a business purpose, and to purge these documents annually by January 31. (TFP Sanctions Mot. at 3.) In checking individual computers, the AAR Defendants claimed to have found "very little else." (*Id.* at 3-4.) That August 29 e-mail also made clear that in November 2006, a new policy was implemented, under which automatic purges are conducted every weekend; e-mails may be retained a maximum of eighteen months, and there is no minimum retention period. (E-mail from Stucki to Curry of 8/29/07, Ex. A to TFP Sanctions Mot.) TFP contends that defense counsel contradicted this representation in open court, telling the court that AAR instituted the new policy as of November 2005. (TFP Sanctions Mot. at 4.) According to defense counsel, this mis-statement of the year in which the new policy was implemented is minor and immaterial. (AAR Sanctions Resp. at 10.) The court concurs with this interpretation.

The court can identify no newly discovered evidence that would justify re-opening the issue of whether discovery sanctions are appropriate in this case. "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisee Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996). While

---

[9]    In response, the AAR Defendants contend that there is no such server but, rather, that CH Admin is the Chicago Administrator's profile located on the Chicago office computer system of the AAR Defendants' legal counsel. (AAR Sanctions Resp. at 2.)

TFP claims that it has newly discovered evidence, it apparently refers to the e-mails retrieved in June 2007, which cannot be considered newly-discovered. In addition, TFP offers no new reason to revisit the court's prior ruling that sanctions are not appropriate. Furthermore, the court doubts that the extreme sanctions TFP seeks (including default judgment) are appropriate in this case, as there is not "clear and convincing evidence" that the AAR Defendants intentionally lost or destroyed evidence. *Rodgers v. Lowe's Home Ctrs., Inc.*, No. 05 C 0502, 2007 WL 257714, at *7 (N.D. Ill. Jan. 30, 2007). The general rule is that TFP must likewise show that the AAR Defendants had a "culpable state of mind" to merit imposing evidentiary sanctions. *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004); *see also Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) ("The prevailing rule [in this circuit] is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.") (citation omitted). At best, TFP offers unsubstantiated speculation that any spoliation of evidence was intentional. This falls far short of the standard for imposing a default judgment or other case-dispositive sanction.

Moreover, the court does not believe that an evidentiary inference would save TFP's claims, even if TFP's speculation that the AAR Defendants destroyed evidence were supportable. As explained here, TFP's claims fail on summary judgment, because TFP has not provided any evidence that it secured the NWA-AAR Contract. Evidence of the communications TFP had with NWA, or the reasons NWA ultimately decided to award the contract to AAR, is not likely to be contained on AAR's computers or servers. The court would expect that TFP itself would be the first and best source of evidence concerning the efforts it made to influence NWA's decision. No TFP representative, including Cooper, has presented evidence of communications, meetings, presentations, phone calls, or anything else he did to move NWA and AAR toward agreement on the hydraulic and pneumatic component contract. With regard to the actual reasons for NWA's decision to award that contract to AAR, the testimony and communications of NWA, not AAR, would

be the most probative evidence.  And to the extent additional correspondence between AAR and

NWA from late 2004 was destroyed in the ordinary course of business or otherwise, this evidence

would merely bolster claims that NWA and AAR had a longstanding relationship.  Thus, it would

support the AAR Defendants' position, that TFP was not the procuring cause of the NWA-AAR

Contract.  Accordingly, the court is not convinced that any e-mail destruction that did occur would

prejudice TFP.

In its response, the AAR Defendants invite the court to impose sanctions against TFP in

connection with this briefing.  (TFP Sanctions Resp. at 12-13.)  The court declines to do so.

## CONCLUSION

Defendants  AAR Corp.'s and AAR Allen Services, Inc.'s motion for summary judgment (61)

is granted.  Plaintiff Trade Finance Partners, LLC's motion for sanctions (72) is denied.

ENTER:

Dated:  March 31, 2008

_____
REBECCA R. PALLMEYER
United States District Judge